Good morning. May it please this honorable court. My name is Howard Beledoff. I represent all the appellants in this matter. With me at counsel table is Solanne Olson and Mr. Cohn who is representing the amicus. Will you be dividing your time or how will you be handling that? No, your honor. I will be conducting the entire argument. I would like to reserve, however, six minutes for rebuttal. All right. I'll let you know. Appellants appeal today the denial of a preliminary injunction that they sought to prevent their eviction from a homeless shelter and the residence where they previously resided. The issues before the court concern the district court's application of the standards for preliminary injunction and the court's analysis of the appellant's housing claim and the appellant's constitutional claims under the Idaho State Constitution and under the First Amendment establishment clause. The plaintiffs sought an preliminary injunction six weeks after filing their complaint because on September 2nd, 2005, the city entered a lease with the Boise Rescue Mission who describes itself as a Christian 501C3 nonprofit. You want to get a glass of water or anything? Yes, your honor. Stop the clock for him there. I don't want you to waste a lot of time on the facts here because I think that we, I mean, I think we pretty much have that, but there's some meaty issues here as far as that goes. Yes, and I was going to address that, but I think it's important, and I do point out repeatedly in my brief, that the court made certain findings which bear upon the analysis in this case and which the appellants believe certainly favored the issuance of the preliminary injunctive relief. What we contend is, with regard to the standard for preliminary injunction, the standard that is recognized in hundreds, probably nine circuit cases, that the district court, after its finding, that there was no question that the appellants would suffer irreparable harm from their eviction and there was no question that the balance of hardships tipped in the favor of these residents. That under the legal, its legal, his legal analysis under the Fair Housing Act and the First Amendment issues, that the appellants had no probability of chance of success on the merits and had failed to raise any serious questions. We sincerely disagree with that. We think that the court failed to recognize the proper continuum, the proper analysis of what was required to show when you have that irreparable harm and you have that balance of harms in your favor, what the level would have to be to raise serious questions. Well, there is, you know, obviously every time, I mean, we've got establishment clause issues and we've got discrimination issues. Those are always going to be serious legal issues. So the fact that you can claim that you've got a constitutional violation, that can't in and of itself be the end of the inquiry. But there's a couple of things that, there's a, I think a factual finding by the district court here that I want you to grapple with for me. And I'll just tell you what some of my concerns are, and these are for everyone, but, because I think this is a difficult case. The district court, I believe, made a finding in terms of that this was a temporary situation so that there, then they were going to put women elsewhere and that this, you know, this was sort of a continuum. And then also I think that there's information in the record that talks about the, that, you know, the type of people, the homeless population in terms of that you deal with felons, that you deal with, you know, there's, you know, dangerousness issues that I see raised up. You deal with people, a high mental health component, dangerousness, the vulnerability of children, women in terms of assault and all of those. So, and then I guess the court, the district court applied the McDonnell-Douglas, and so I'm, so you've got whether, if that's there. But let's say even if you have, if you apply Johnson, there's a couple of exceptions that can come up there, and that could be, that could be the dangerousness security issues, if we're, the protection issues. And also, too, if the long-term goal is that this would eventually benefit the women to be in a more secure situation and all of that. So you've got all of that in the backdrop. And then another thing that concerns me is sort of the factual predicate. What, are municipal governments required to provide homes, you know, shelters for the homeless? And I, you know, I can't, I don't want to sound hard-nosed about this, but I don't know that as a society or in the Constitution that I see anything that says that you have to, you know, that you have to provide for the homeless. And then, and I think that all sort of flows over to that a lot of these shelters, the people that are willing to, it's not like everyone's stepping up to the plate and saying, hey, I'm willing to shelter the homeless. And a lot of the people that do it are faith-based groups. So, you know, all of this, you've got all of this going on in one factual situation. And it's a preliminary injunction that eventually this is all going to be decided. So why is it, so why did the district court abuse its discretion if it found that this was, the bigger picture was we're going to have a place for women in the end. And I've excised the part about you can't talk to people about religion anymore. I mean, why is that wrong for a preliminary injunction when all of this is going to be litigated later? Well, let me address it. I know that's a lot. I know. But that's everything, that's everything I'm worried about. And I'm prepared to address each one, the safety, the conversions, and why this, why the city has to provide this housing. With regard to the safety, of course, that was under the McDonnell-Douglas burden-shifting standard, which we believe Johnson, because of men's only restriction, actually usurps that. And it's not applicable under Ninth Circuit and U.S. Supreme Court precedent. But let me talk about this safety. The court had before it the minimum record of safety. What it had before it was a statement and a letter written from the exec director of the mission to the city in which he states that the Boise rescue mission had half the number of police calls than community homes. Right. There's not a single report, there's not a single indication how the exec director would know what's in the Boise city records. Okay, let's assume that's not that persuasive. But where am I getting the declaration about who this population is and the dangerousness of that? That's in the record, too. Right? No, I don't believe it is. Well, how do I know that, then? What you're referring to is a report that is a city report that was never submitted in the record that was referenced in an affidavit by defendant Chatterton, who, regarding May of 2004, which he wasn't on the committee, it was a city-appointed committee, he wasn't on it, he wasn't even employed at the city, in which he made reference that there was a recommendation that the look at this mixed population and maybe turn over community house to another nonprofit. I think you have to balance that with what you have here. Why would I be reading something that's not in the record if that's – I mean, I didn't go and pull – I didn't go find that. I'm not making – I don't recall it, Judge, Your Honor. I think maybe you're looking at the safety and saying, well, there's a safety issue. But, in fact, this facility was a modern constructed facility. It had three floors, completely separated, private facilities for gender, different genders. It was monitored. We had a ten-year record of safety, of privacy. There is no evidence of any kind of problems. There is Mr. Orozco's opinion, but there's no substantial evidence at all. And I think that has to be balanced against what is in the record. The record, which was composed of documentation and declarations, shows that what community house did was it served a valid community need. It housed women and children and families. It housed disabled people. It housed families who did not have any other shelter. It provided permanent housing on the third floor to 39 individuals. It provided transitional housing on the second floor. This is not only a homeless shelter for families and traditions until they get permanent housing. This facility was constructed with millions of dollars in federal funds. It was approved by the Department of Housing and Urban Development, by the Federal Home Bank. They would not approve a facility without safety considerations and without a concern about women and children. There is no evidence of any assaults. There is no evidence of any sexual abuse. Your reference to sex abusers? I think it's an affidavit of Bill Orozco, which I think is BRM's executive director. I think that is in the record, because he talks about who there are over 70 percent of our guests are homeless as a result of alcohol abuse and drug addiction, violent felons, registered sex offenders. We estimate that 20 to 30 percent of our guests suffer from mental illness. The homeless population is a difficult population to serve under any circumstance. The problems are exacerbated in a mixed gender shelter. Further, it is not always appropriate to have families, particularly families with young or vulnerable children, sleep in the same facility as other members of the homeless population. He is talking about his facilities, which are dormitory facilities, have no separate rooms. They put them all in one room and they sleep there. Certainly you can't put men and women together. That's what he's referring about his facility. He's not referring about community house. That's a completely different situation. And the record also reflects that, in fact, community house did not allow sex offenders, did not allow violent felons. So it is his facility who had the danger problem, not community house. Community house was a safe haven. Community house was a place where these people could go. Given what has happened, given the men's only restriction, what is the alternative for these people? Is it better for the women and children to live on the street? Is it better for them to be in the car during last winter? Bill Roscoe admitted he had no plan, no feasibility study to convert that old facility for women. He had five years' rent at $1 a year. Where's the incentive for him to go and convert that? There is none. He didn't have a plan. There's none in the record. Those women, the court found conditions was worse. They had no place to go. The city gave them vouchers for a few days at a motel or a month at best, where they put them in dilapidated, run-down, filthy, mold-infested mobile homes. And that was only a small handful of them. The rest were shuffled out the door. The evidence in the record is that the court found there's a shortage of these facilities, especially for women and children and families. The court found while the men could reapply, the women could not. His words were they were shut out. And the women had no place to go? Is that what you're saying? They had no place. The city made no arrangements for them. They had no place to go. Boise is a relatively small town and had limited facilities. And the city made no attempt except these temporary measures for a few people. And the end result, the net loss to families, mostly women in housing, was 50 units. That's the net loss by this male occupancy restriction. Well, what do we do with the court's finding that, yes, it was a short-term hardship for a better long-term goal? What do we do with that? I don't think that's the standard, Your Honor. No, I know, but we still have to deal with something with that finding. I don't think it's short-term. There is no women's shelter. The mission has never converted anything. They still house men. The court was errant when it said that this would create and serve more men. In fact, it really does. But you made those arguments, and the court ruled against you factually on that. That's what I'm saying. I mean, I have to put my appellate hat on here, and I've got to deal with factual findings. I've got to deal with the law, all of that. And I see that as a factual finding that I've got to deal with. Yeah, there's no question. I would have decided this differently. You know, I've got to deal with factual findings if I'm going to. Right. But I think the factual findings that we have about the effect clearly warrant, given the irreparable harm, serious questions. I mean, serious questions are a fair chance of success, that under the circuit case precedent, the court should give a party to maintain and preserve the status quo, and that's what not they changed the status quo six weeks into the case to allow the case to continue and not throw out the plaintiffs into the street. That was another factor the court failed to consider. I know I haven't addressed the Establishment Clause issues, and I'm going to reserve the rest of my time, and I'll try to. I have a question, and I need to answer it at this stage. It's different from Judge Shallahan's concerns, and that's just that the lease, and this is the argument in the red brief, the lease between the city, from the city, is neutral with respect to gender and religion. And these conditions are imposed by the leasee. How can you, you know, hold the city of Boise liable for a lease of that nature, either under the Fair Housing Act or under the Constitution? Well, the court finding was that it wasn't neutral. The court finding that the city, as the proxy, as a proxy. The court found that that facility was going to hold 106 men. That's a finding, and that was based upon Reverend Roscoe's letter in which he specifically states that. Where's the finding in the? It's a. Well, maybe you can find it later. I can find that later. Yes. No, so it is not neutral. And the cases have found those types of proxies, what they call proxies, will not obscure or in any way excuse discrimination, that you can't hide behind a proxy if, in fact, all that means is, yes, means male. What it really means is no women, no children, and we're not going to take your disabled like we did before. Well, that's your argument, that if you find it to be a proxy, then it's a facial challenge and Johnson applies as opposed to McDonnell Douglas. Am I correct? Yes, Your Honor, and that's what the district. And you're saying that the district court made a finding that it was a proxy. Yes. It's on page three of the opinion. It talks about Boise Residential Plan for 106 men only. So that would have been, I think it's 373, I think, on the excerpt. All right. Do you want to reserve the balance of your time, then? Yes, Your Honor. Okay. Thank you. Good morning, Your Honor. My name is Phil Colare, and I represent the City of Boise in this matter. Your Honors, what I would like to do is immediately just address the questions that the court raised to my colleague. Well, was that what he referred us to in the record? Was that a finding, or is that just a statement, or what was that? Did the court make a finding that guess was a proxy for men? No. No. The court never said any such thing. What he was talking about, what the court was doing in that portion of the opinion is identifying this is the proposal, what the rescue mission is going to do, how they're going to run the facility. And that's all it did. What the court also found is that the rescue mission, responding to the city's questions, because if you look at the RFP submitted by, that was first requested by the city and then responded to by the rescue mission, what's very clear is what the city envisioned and wanted was essentially a vendor to come in and do a turnkey type operation. They said the preference was going to be given to folks who were going to take it over in its current operation, employ the same employees, keep everybody there. That is what they wanted. They didn't, they were going to give preference to that. Now, they didn't say don't bother proposing if that's not what you want to do. And the rescue mission then made a proposal identifying how it intended or wanted to run the facility when they did that. Well, did you raise this issue in the district court that, you know, the boys who just by leasing the property is not engaged in housing discrimination because the lease is neutral? We did argue that. We did argue that. Did the district court deal with that argument? Really didn't, Your Honor. It's pretty obvious in the transcript of the oral argument that was a suggestion that I made is because what's going on here is the city made the decision that they were not going to be in the shelter care business anymore. And my argument is that decision itself is not a discriminatory nor an unconstitutional one. It is a political question, a hot political question, without question, without doubt. But it's not a constitutional or a discriminatory decision provided, they say, if they kept the shelter open for only certain types of folks, that would be a different issue. Well, I guess, you know, what is the underpinning for cities providing homeless? I mean, is there any right for people to have homeless shelters? Is there any, you know, is that, as you say, it's a political question of each community decides how are we going to address our homeless situation. And at this point, the city of Boise said, we want to be out of the business. I believe there isn't a constitutional or a statutory requirement that cities be involved in running homeless shelters. Obviously, if they apply for and receive federal monies and grants that are conditioned upon running those facilities, that's a different matter. And isn't that what happened here? It would, but that is why the city repaid the HUD monies. They repaid $1.3 million of HUD money, because they knew those monies were tied to the city's continuing running of that shelter. But also keep in mind, with the city, one option obviously was just closing down community house and boarding it up. They didn't want to do that. They could, but they didn't want to do that. And that's very clear. So if they closed it down, then you can't claim that to be discriminatory, but then everyone's out on the street. Absolutely. And that's also a finding that the district court made when he – when the court found the evictions were not discriminatory. That's in – the court specifically found that. And the reason for it is everybody was treated exactly the same. The suggestion that – Wait a minute. They weren't treated the same. The women couldn't move back in. The men could. The initial evictions, they were treated the same. The idea of whether they could move back in under the operations by the rescue mission to that building, then that is the deferential treatment, and that's how the court approached the question. And I think what's important is, and that's how the city approached this, is when the rescue mission's proposal came and they were going to use the facility primarily or exclusively as a men's facility initially, they asked the question of how are you going to deal with women and families. And the rescue mission responded to that by telling, we are not going to shut out women or families. We plan to provide services for women, children, and families at a different facility. And were those facilities then available? If Mr. Beladoff says for only a few people and they were inferior and the rest of the women were just shut out with nothing. I think initially what Mr. Beladoff is referring to were the people that had lease agreements with the city in the SOSOR units, but they're actually tenant agreements. And with those folks, what the city did is relocate them. The people that were overnight guests, they're not evicted. What they were told is they were given advance notice, 30 days advance, that on such and such a date, city is going to stop accepting people in overnight and we're going to close because it is. They weren't evicted because they were told they couldn't come back. Correct. Correct. Is there a difference in that? Well, there is. The eviction connotates that they have a landlord-tenant relationship. They did not. They did not have a landlord-tenant relationship. They're there on a temporary overnight basis, first come, first serve. So addressing the safety issue, Your Honor, and I think that's an important issue because that is a primary, well, it's not a primary, but it's an important factor that the district court considered. Well, the record could have been better than it was. And I don't quarrel with you on that point, Your Honor. Where the safety issues are at, you are correct, it is described in Mr. Roscoe's affidavit. It is also described in the rescue mission's RFP. So that is part of the information the city had when it was considering this and why are they going to propose to run this facility the way they are. The point, I think the thing that's important in the information that the city was given about the nature of the homeless population, it's mostly men. Seventy percent of their folks have alcohol and drug dependencies. Thirty percent of those have untreated mental health issues. It is a problematic population. And my thought is, is why do you have to sit and wait for a tragedy to occur to recognize there is a real risk? Let's just assume for sake of argument that the court was wrong in using the McDonnell-Douglas shifting test and that this is really a Johnson issue, that guests are a proxy for men and it's facially discriminatory. Can the city still prevail? I believe so, Your Honor. If we're looking at a facial challenge to this entire, what the city did, I think the facial challenge starts by looking first at the proposal that the city sent out, requesting people to come in and give proposals of how they would take this facility over. And if you look at that, there is absolutely nothing indicating any preference for any group or any discrimination. I couldn't think the question went beyond that, and that is to suppose there was this facial discrimination shown and established. And, in fact, the district judge said there is a discrimination here because the men can come back and women can't. But does that mean the city loses or can the city show that, well, that's right, but the reason the women can't come back is because of safety, and does the safety showing made in the case then remedy the or make the discrimination okay? I think it does, Your Honor. Because I think that's where the question was leading. Yeah. I think there's two ways that if the city can satisfy it on this record, if you have to comply with Johnson, is that the ordinance benefits the protective class. If what you're saying, because I believe the district court made a finding, yeah, it's a short-term downside for women and children, but it's a long-term benefit while we're in this process. Then there's two, that it responds to a legitimate safety concern raised by the individuals affected rather than based on stereotypes. So those are the ways that if it's a Johnson test as opposed to McDonnell-Douglas, the record would have to satisfy either of those in order to affirm the district court. And I believe they do, Your Honor, for a couple of reasons. First, as I indicated, the RFP is neutral. The response that the BRM gave, and obviously you don't have before you any other request as to who else was involved or whether vendors weighed in on this, but what the BRM proposed and the questions that the city had was, we're recognizing that you are proposing to not house women in this particular facility, and why? Why do you propose not to do that, and how are you going to provide services to that group? And the obvious conclusion to there is they are not going to accept this proposal unless women and children are provided for. And what the rescue mission provided them is they have another facility ten blocks away, which is less than a ten-minute walk in Boise, that has 30 beds for women only and is not completely full and has beds available, and an additional ability to expand that another 30 beds. So how many displaced women are there to be concerned about? Excuse me? How many displaced women are there to be concerned about? Yes. In the old CHI building, they had 13 units for women. Thirteen? Thirteen. In the BRM facility ten blocks away, there are 30 with a 30 percent, traditional 30 percent vacancy rate, which is nine, and then the ability to add another 30 beds. And they also have transitional housing and apartments across the street. Well, you're saying there were places then for these women to go that were okay places. There absolutely were. Without question, there were. Did the district court find that? The district court referenced it in its opinion and I think considered it in its balancing of the hardships, the idea being there may be some initial displacement, but the idea being of what the rescue mission is going to do is overall expand the number of beds and facilities, and if you balance that against the other alternative is the city wanting to no longer be in the shelter business is the beds just simply disappear. And that's not a real – nobody really wanted to do that and nobody wanted to get to that decision, but eventually if nobody would step up and do this, that may very well be a possibility. So. Well, let's see. Now, if I get outside the record, you say, well, that's outside the record, I can't tell you. But the preliminary injunction was denied. How long ago did this occur, the denial? A year ago or so? Oh, I've got the opinion. What's been going on in the meantime? That's what I want to get at. Are there men there now? There are. And women are being relocated or what's going on? The facilities that are – I'm starting outside the record. The facilities that the BRM had and said they did have, they are there. I know that the BRM is making progress and efforts towards the plans, the future plans that they were working on. And they're raising the funds to do that. My understanding is they're very close to accomplishing it. But it takes billions and billions of dollars. But it's outside the record. Turning to the – if you have any other questions about the discrimination issues, I'd be willing to – I'd be more than willing to respond to them. I believe the McDonnell-Douglas, once you get past the facial challenge and you get into a McDonnell-Douglas burden-shifting analysis, the district court was absolutely right. The idea – Excuse me. I was going to get to the Establishment Clause question. And that seems to be that the city leased this to a Christian organization, knowing that the organization is going to use the property to advance the Christian message. You might not have to attend the 60-minute service pre-meal in order to get your meal, but they're still going to have their services, and that the city has done this. Is this a violation of the Establishment Clause? No, it isn't, Your Honor. And for the reason that we put forth, first you have to look at the standard for government leasing its property to religious-based organizations is one of – the leasing process in the lease itself or the sale itself, looking at it as a disinterested, informed individual, would look as if the government is wrapping its arms around and favoring or endorsing advancing the religious message. And if you look at the RFP, it's not. The lease does not either. And I think that's – Well, let me chase a little bit. I don't know what the competition is for this, but in my experience having been a trial judge, a lot of the programs that deal with substance abuse, homeless, all of those are faith-based. Is – I mean, is – so if, you know, the thing is, I guess, I mean, if you were picking me from saying, hey, I want a Christian program as opposed to I want a, you know, a Jewish program, then maybe you have that issue. And then I'm wondering, too, in terms of that are people being – you know, what is an individual's right in this society to have shelter provided by the government? And what autonomy does an individual retain in terms of where they choose to go? Now, obviously, homeless people are in pretty bad situations. And a lot of the people that are homeless are children, and they really don't have a whole heck of a lot of choice about that. But by the same token, does it – is – do we have to be forcing them to go there? And does the government's purpose have to be picking a Christian-based program before you get to an establishment cause problem or what establishment cause problem? Well, I – I mean, that sounds hard, but I'm – you know, hard-hearted. But I'm trying to grapple with these constitutional issues in terms of what people – you know, what are people's rights in this society about that? Well, I – it is a difficult – it is a difficult issue. I appreciate that. Frankly, from just a cold analytical approach, is the government constitutionally required to offer housing or shelter to homeless people? Probably not. If they're going to do it, then they have to comply with the law. What is happening here to comply with the law and not run afoul of the establishment clause is – and I agree with you that generally people that are – that provide care for the homeless and for this – for these populations are often faith-based organizations. But that's not the government's doing. I mean, if there is nobody else that's willing to be involved in this, that's not the government's doing. What then the government must do, and that's been borne out by the – I mean, guidance can be getting from the – in providing of aid or money to parochial schools. And the question there is, is it a matter of truly private choice of the individual once they obtain the services? I mean, obviously, in the context of the people who get services at the BRM on city property, if they truly have the personal choice of not participating, then I don't believe the establishment clause is implicated. Because obviously there may be folks that do want to participate, and that's their private choice. But if it is preconditioned and there's coercion, then that's an issue. Now, the city never wanted that, and they made it pretty clear when they asked the questions for clarification from the BRM when they got their initial proposal. That is why when the district court in its ruling said, I understand that the city says we don't understand that to be happening, we don't want that happening, so you won't really object to me issuing an injunction to make darn sure it doesn't happen. And that's absolutely true. We have no quarrel with that at all. The BRM in its lease with the city is required to comply with the law and not discriminate. It's right in the lease. If they do that, they breach. And I don't believe they are. Frankly, we welcome the district court's initial injunction to make it crystal clear. That is not what we want. That's not what we expect is happening. And I believe if the people that are there are given the personal choice of being and are participating in the religious services or not, then the Establishment Clause is not implicated. And it's not in this situation. Well, what about, though, the fact that they have a subsidized lease to carry on those activities, subsidized by the State? Well, actually, it's really not a subsidized lease. The idea that this is some favorable deal for the BRM fails to keep in consideration that this is this transaction contemplates an outright purchase for $2 million. In the initial five years, it is a one-year. I know. But in the meantime, they pay a dollar rent. For one year, I mean for five years, community house was for 50 years, $1 a year for 50 years. What the $1 a year takes into consideration. Well, just because they have a good deal doesn't mean you don't have one, too. No. That's true. But what it takes into consideration is the recognition on both sides of the capital and the money that is being inputted by both sides. Community house did when they were operating it and got a favorable lease rate. The BRM is, too. They agreed and said in their RFP they're going to pour substantial amounts of money renovating this facility, and they're going to take over the daily costs, the daily operations, aimed towards buying it outright. Well, I guess your best argument there is that BRM got the same deal that city, that community got. Yeah. It's essentially the same. Actually, it's not as good of a deal because it's not for 50 years. At the end of five years, it goes market rate if they don't buy the building. All right. Are there any further questions from the panel? All right. Thank you for your argument. Thank you, Your Honors. Your Honors, I'm going to try to go through this as quickly as I can. Let me just address that last point. Community house built that place with over a million dollars in donations and a federal home loan bank of $657,000 that they are liable for today. Okay? They didn't get favorable terms. That was their project. The city came in and assisted with federal money. And two months prior to that, the city passed an order and said the minimum value was $250,000. That was in July. In September, they gave the mission $500,000 discount. Let me address the question of Your Honor about the city's not in the shelter business. It is in the housing business. And it still is in the shelter business. It gave it to the mission. It's got over 250 housing units. The city cannot disavow the policies of the mission. Page 15, the excerpt from record of 385, this is what the district court found. Quote, the city cannot disavow BRM's policies that were well-known at the time. The city entered into a lesser leasing relationship with the BRM. As to those well-established policies, the BRM essentially acts as a surrogate of the city. One and the same. This whole idea that they're separate, they don't have anything to do with it, that's just not reality, if you read the lease. But does the government, does the city want to establish that religion, or does the city just want to provide beds for the homeless? The city could have kept on providing beds if it would have maintained the status quo. This facility perpetuates the mission's operating philosophy, segregating men from women, families, splitting families. They even split families up, whole families, in the name of what, safety? I don't think so. They split siblings if they're over a certain age, they can't go in their facility. Could they have closed it, and would that have been their right? I don't think they could have, Your Honor. I don't think that the, you're talking about local political considerations. No, I mean, legally. Legally, could they have closed it and say, I don't want to be in the homeless business? I mean, is it a political question? Well, I don't think so. And I think this court has dealt with political questions on the Fair Housing Act numerous times. In the Oxford House case that was affirmed by the Supreme Court, in the McGeary v. City of Portland case. In fact, in the Turning Point case v. the City of Colwell, Idaho, in each one of those cases they overturned a political decision made by a municipality about an occupancy requirement. And they held that the Fair Housing Act has to be enforced. It has to be enforced liberally to protect rights, not deprive people of rights. Some of these other issues with regard to the population. Mr. Collier talks about 13 women. That's 13 women in the emergency shelter. That's what the court's findings on that are. I think it's on page 2 of the decision. It found 13 women are in the emergency shelter on the first floor. Second floor contains all the families. It found 10 transitional units and 10 family units for a total of 20. However, Francis Ray's affidavit establishes there was such a need they took the family units. And if you look at the schematic in the except for record, I think it's at 385, you'll see these are like hotels with adjoining suites. They shut the doors and they put two families in what was designed to be one. Also, if you look in the district court's findings, the district court found. Unless there are other questions, I'm going to ask you to wrap up. You're over your time. Yes. Well, I just want to say the district court found in June 2005 there was a waiting list of 6 or 7 women and 20 families at community house. These families got, and it found that there was no place to go. There is evidence that Francis Ray called and there was no finding, no place to stay at the City of Lights of the Boise Rescue Mission. I'd also point out that that injunction did not apply to City of Lights where the women had to go. If you look at Ms. Fuller's declaration in the record, you will see what that, what they do to force people to pray there. If you see their application about how they ask about Jesus saves and about do you know Jesus Christ. I guess I'm over my time and I'll just wrap up, Judge, and I'll just say this. Segregation and discrimination was outlawed in this country 50 years ago in Brown v. Board of Ed. If you look at the faces in this room, you will see the progress we have made. This case is about what needs to be done. Thank you. Thank you both for your argument. This matter will now stand submitted.
judges: Thompson, Tashima, Callahan